IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

MARVIN GREEN,

        Plaintiff,

v.

JOHN E. POTTER,
POSTMASTER GENERAL,
UNITED STATES POSTAL SERVICE,

        Defendants

---

**COMPLAINT – CIVIL RIGHTS**
**(JURY TRIAL DEMAND)**

---

Plaintiff, Marvin Green ("Green"), by and through his attorneys, John Mosby and Marilyn Cain Gordon , states and alleges the following as his claims for relief:

## I.    INTRODUCTION

1. This lawsuit seeks monetary damages, injunctive, and equitable relief, for Defendant's willful pattern of retaliatory conduct that was intentionally designed to force the Green to retire from the United States Postal Service.

2. Green alleges that the agency retaliated against him because he opposed discrimination on August 14, 2008, May 12, 2009, and July 17, 2009; and he participated in Title VII protected activity in 2008 and 2009; the last protected activity occurred on or about November 10, 2009.

3. Green's opposition to discrimination and his participation in EEO activity are protected under Section 704 of Title VII of the Civil Rights Act of 1964, as amended.

## II.   JURISDICTION

4. Green has met all statutory requirements and jurisdictional prerequisites for his Title VII civil rights claims.

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and §1343, this being an action brought under Title VII of the Civil Rights Act of 1964, as amended and the Civil Rights Act of 1991.

## III.   PARTIES

6. Marvin Green, a black American, is and was a resident of the state of Colorado at all times pertinent herein.

7. John Potter is the Postmaster General of the United States Postal Service. The Postal Service is a federal governmental agency.

## III.   FACTUAL ALLEGATIONS

8. On August 4, 1973, Green began his employment with the agency.

9. On February 9, 2010, Green signed his retirement papers, with his retirement effective on March 31, 2010.

10. During Green's employment with the agency, he worked in management for 25 years, including 14 years as a postmaster,

11. During Green's employment with the agency, he had an unblemished employment record and was never disciplined.

12. Starting in 1973, Green's career blossomed. He advanced from a position of letter carrier to Postmaster.

13. Green's most recent promotion was in 2002, to an EAS-22 level Postmaster at the Englewood Colorado Post Office. The Englewood Post Office is in the Colorado/Wyoming district. Green supervised approximately 300 employees and 4 smaller post offices.

14. Since at least 1985, the agency has used its Officer-in-Charge program ("OIC"), as one of its mechanisms to prepare and advance employees, including postmasters, to the next higher level position.

15. The OIC program provides employees with opportunities to serve in assignments or details at the next higher level position. When the OIC assignment or detail ends, the employee, if qualified for the next higher level, is evaluated as "Ready."

16. Green joined the OIC program early in his career. On September 29, 1986, Green received his first OIC postmaster assignment, which lasted 7 months.

17. At the end of that first assignment, in 1987, Green received the following evaluation:

> "Mr. Green worked well with the employees and the community. He assisted his employees in upward mobility and maintained compliance with FLSA.
>
> The knowledge and job experience gained by Marvin during this detail have provided him a good background for promotional or additional detail opportunity. Mr. Green completed this assignment in an excellent manner."

18. Green's last OIC assignment occurred on September 30, 2006, as an EAS-24 postmaster at the Fort Collins, Colorado Post Office.

19. The Fort Collins' assignment ended on September 1, 2007. Green was rated as "Ready" for an EAS-24 postmaster position.

20. In early 2008, an EAS-24 postmaster position opened at the Boulder, Colorado Post Office.

21. Green had been a manager at the Boulder Post Office from 1989 to 1996. Green had also served in an OIC assignment as an EAS-24 postmaster at the Boulder Post Office.

22. In February 2008, Green submitted his OIC application officially requesting to be detailed to the open Boulder postmaster position.

23. Greg Christ, Green's immediate supervisor, was the decision-maker for the Boulder OIC detail. Christ was also ultimately responsible for selecting the permanent Boulder postmaster.

24. Christ, in contradiction to the OIC policies, never responded to Green's application for the Boulder OIC detail.

25. Instead, after Christ received Green's application, he contacted a non-black postmaster and informed that employee that he was being detailed into the Boulder postmaster position.

26. The individual Christ detailed had never joined the agency's OIC program, had never requested a detail to a higher level position, and had never competed for a postmaster position.

27. In July 2008, Christ selected this same individual to permanently fill the Boulder postmaster position.

28. On July 11, 2008, Green contacted an EEO counselor.

29. On August 14, 2008, Green filed a formal EEO complaint alleging denial of promotion based upon his race.

30. Shortly thereafter, Christ, who Green alleged discriminated against him, started retaliating by bullying and harassing Green.

31. On October 21, 2008, the agency completed investigating Green's EEO complaint.

32. On November 7, 2008, Green submitted his request to the agency for a hearing before the Equal Employment Opportunity Commission.

33. After Green requested an EEOC hearing, Christ's retaliatory conduct escalated and continued into 2009.

34. During this time, Green was a member of the National League of Postmasters.

35. Richard Sprague was the NLP's Colorado Branch President.

36. Around March 2009, Green sought Sprague's assistance to stop the agency's retaliatory harassment.

37. On March 10, 2009, Sprague and Green met with Christ to protest his retaliatory bullying, threatening, and harassing conduct toward Green.

38. After the March 10, 2009 meeting, Christ started harassing Green on a daily bases; he would give Green instructions, then go behind Greens' back and talk to Green's staff and give them different instructions.

39. In 2009, Charmaine Ehrenshaft was Manager, Labor Relations for the agency's Colorado/Wyoming District.

40. Ehrenshaft, in the course of her duties, was aware of EEO activity and EEO complaints file in the Colorado/Wyoming district.

41. Ehrenshaft normally communicated with postmasters through their supervisors regarding Labor Relations' matters; but in March or April 2009, she started directly contacting Green over grievance issues.

42. Around March or April 2009, Green started receiving harassing emails and correspondence from both Ehrenshaft and Christ.

43. On May 12, 2009, Green again contacted Sprague regarding the harassment. Sprague wrote the following to Christ:

> "I'm a little confused by all this micro managing of Englewood and your going behind the PM's back to talk to his staff. My confusion is why you would take one of our best performing offices (an office that at mid year is achieving most goals) and feel the need not to [sic] more supportive of this PM...
>
> \*\*\*
>
> If this is the way we treat one of the good offices then I'm to assume you are giving the none performing office [sic] three times the attention Marvin is getting. Last month you agreed to work on the communication between you and Marvin however I must be honest, to me all that happened is we got more micro managing. I ask you again to work with Marvin in away (sic) that is beneficial [sic] the Postal Service. We need PM's like Marvin more than ever."

44. On May 14, 2009, Green initiated EEO counseling and filed an informal EEO complaint alleging that the agency was retaliating against him.

45. Around this time, Green learned that Christ was retiring from the agency.

46. However, Ehrenshaft's contact with Green increased and her emails started including negative criticism of Green's day to day operation of the Englewood Post Office.

47. On July 2, 2009, Green emailed the following to Ehrenshaft, "Char, It is time for the harassing e-mails to stop..."

48. On or about July 17, 2009, Green engaged in EEO activity by contacting the agency's EEO office to file an informal EEO complaint alleging retaliation.

49. On August 12, 2009, the agency's EEO office informed Green that it had "concluded the processing of your claim of retaliation initiated on May 14, 2009" and informed him of his right to file a formal EEO complaint within 15 days.

50. In its August 12, 2009, letter the agency EEO office also stated:

> "For your information, the agency (USPS Law Department) was going to file a request to amend this current complaint into your prior EEO case #4E-800-0232-08 which is currently pending at the pre-hearing stage with the EEOC (Equal Employment Opportunity Commission (EEOC). The request for amendment has not been submitted as of this date."

51. On or about November 10, 2009, the EEOC gave the agency notice that the discovery process on Green's 2008 EEO complaint would begin and that the complaint would be set for hearing.

52. On November 25, 2009, while Green was at home on leave for the Thanksgiving holiday, Ehrenshaft had a certified letter delivered to Green's home that stated:

> "You are instructed to appear for an investigative interview *regarding allegations of non-compliance in the grievance procedure.* This interview will be held on Wednesday, December 2, 2009 at 1:00 pm in the Denver, Colorado Administration Building, Labor Relations Conference Room."

53. Green advised Ehrenshaft that Robert Podio, President of the Colorado Chapter of the National Association of Postmasters of the United States, would be representing him in this meeting.

54. On December 1, 2009, Podio, via email, informed Ehrenshaft that the meeting needed to be rescheduled. December 11, 2009, was agreed upon as the new date.

55. On December 9, 2009, Green held his monthly meeting with his then supervisor, Jarmin Smith. Green asked Smith why Ehrenshaft was investigating him.

56. Smith stated he did not know, but informed Green that Ehrenshaft had contacted him. Ehrenshaft requested that Smith provide her with anything he had on Green.

57. Smith informed Ehrenshaft that he was not having any problems with Green, but told her he would forward to her a file that Greg Christ kept on Green and that Christ had emailed to him.

58. On December 11, 2009, the investigative interview occurred.

59. During the interview, Green was interrogated for, inter alia, intentionally delaying the mail.

60. Green had received no notice that "intentionally delaying the mail" was going to be a topic at the investigative interview.

61. Ehrenshaft and her boss, David Knight, interrogated Green for approximately two hours.

62. When the interview ended, Green was preparing to leave the room when two agents from the Office of Inspector General ("OIG") appeared.

63. The agents informed Green that they had been ordered to interrogate him for criminal conduct.

64. The agents informed Green that "intentionally delaying the mail was a felony offense," for which criminal charges could be filed.

65. Green informed the OIG agents that he had already been investigated for "intentional delaying of mail."

66. At the conclusion of the OIG interrogation, the agents informed Green that the intentional delay of mail issue would be referred to the United States Attorney's Office, and that the U.S. Attorney's Office would decide whether criminal charges would be filed.

67. When the OIG interrogation ended, Ehrenshaft and Knight reappeared.

68. Green was ordered, without discussion or explanation, to sign an Emergency Placement memorandum.

69. Ehrenshaft and Knight ordered Green to immediately surrender his Agency identification and Agency cell phone.

70. Ehrenshaft and Knight ordered Green not to return to the Englewood Post Office.

71. The Emergency Placement memo informed Green of "Emergency Placement in Off-Duty Status" and further stated, "The reason(s) for this action is/are: Disruption of day-to-day postal operations." The memoranda also stated, "The employee is returned to duty status when the cause for **nonpay status** ceases." (Emphasis added).

72. On or about December 15, 2009, Podio contacted Green and informed Green that the agency had forwarded to him (Podio) a settlement document.

73. Podio informed Green that he had received the agency's settlement document, via email, from Ehrenshaft.

74. The terms of the agency's settlement document required Green, in order to be paid while on Emergency Leave, to take a downgrade to an EAS-13 postmaster position; and to either retire from the agency or transfer by March 31, 2010, to a position 400 miles from Denver, in the state of Wyoming.

75. The terms of the agency's settlement document required Green, if he transferred to the EAS-13 postmaster position to take an approximately $38,784.00 reduction in salary.

76. The terms of the agency's settlement document required Green, in order to get his next paycheck, to use his annual leave from December 14, 2009 thru December 18, 2009.

77. The terms of the agency's settlement document required Green, in order to be paid after December 18, 2009, to use his sick leave from December 21, 2009 thru March 31, 2010.

78. The terms of the agency's settlement document allowed Green's annual and sick leave to be paid at his current EAS-22 salary until March 30, 2010.

79. After Podio informed Green of the agency's terms for Green to get paid, Green asked Podio why the agency was downgrading him to a EAS-13 and forcing him to transfer to another post office to get paid.

80. Podio told Green that this was the best deal he could get and that it could take up to a year before Green received a paycheck or got a hearing on the Emergency Leave/nonpay status issue.

81. Green stated to Podio "this ain't right." Podio then advised Green that the agency's settlement document did not require Green to waive his EEO rights to file a complaint on any of the agency's actions.

82. Green signed the agency's settlement document on December 16, 2009.

83. On February 9, 2010, Green signed his retirement papers, effective March 31, 2010.

84. On March 22, 2010, Green contacted the agency's EEO office to file an informal EEO complaint.

85. On April 26, 2010, Green filed a formal EEO complaint alleging that he was forced to retire (constructively discharged) based on retaliation.

## CLAIMS FOR RELIEF

### Civil Rights Violations of Title VII of the Civil Rights Act of 1964, as amended and the Civil Rights Act of 1991

86. Green incorporates by reference paragraphs 1-85 above.

87. Title VII's anti-retaliation provision promotes the statute's primary objective of ensuring a workplace free from discrimination on the basis of race, ethnicity, religion or gender "[b]y preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees."

88. Green has suffered an adverse action based upon retaliation. An adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

89. The "adverse action" determination is a fact-specific inquiry that "depends upon the circumstances of the particular case"

90. Green asserts that he suffered continuous retaliatory conduct after he filed his EEO complaint in August 2008 and after he engaged in Title VII protected activity in 2009.

91. Green asserts that the agency's retaliation continued into the year 2009 and increased in severity each time he participated in Title VII protected EEO activity.

92. Green asserts that EEOC's Acknowledgement and Order sent to the agency on November 10, 2009, was protected activity under Section 704 of Title VII.

93. Green asserts that the agency's action of serving a "notice" of investigative interview upon him at his home, on or about November 25, 2009, was based upon a retaliatory motive, in violation of Title VII, and sufficiently close to the Title VII protected activity to infer retaliation and he asserts this act as a separate actionable claim.

94. Green asserts that the investigation on the delay of mail issue was without merit, was lacking in substance, and was a sham.

95. The December 11, 2009, investigative interview was based upon a retaliatory motive, in violation of Title VII, and Green asserts this act as a separate actionable claim.

96. Green asserts that the agency's act - threat of criminal prosecution- by the United States Attorney's office during OIG's interrogation was groundless, was lacking any objective factual basis, and was based upon a retaliatory motive, in violation of Title VII, and Green asserts this as a separate actionable claim.

97. Green asserts that the agency's act of placing him on emergency leave in a non-pay status on December 11, 2009, was based upon a retaliatory motive, in violation of Title VII, designed to place him under extreme emotional distress and Green asserts this as a separate actionable claim.

98. Green asserts that the agency forcing him to retire was based upon retaliatory motive, in violation of Title VII, because the agency made his working conditions so intolerable that a reasonable person in his position would feel compelled to retire. Green asserts this as a separate actionable claim.

99. Green asserts that after he engaged in activity protected by Title VII, the agency's retaliatory acts included, but were not limited to, a calculated pattern of harassment, bullying, insults, humiliation, and unjustified disciplinary actions. The agency sought to and did intentionally inflict severe emotional distress upon Green that has resulted in emotional injury for which he seeks damages.

100. Green asserts a causal connection between his protected activity and all subsequent adverse employment actions taken against him by the agency.

101. As a direct and proximate result of the agency's actions, Green has been emotionally harmed and continues to suffer damages.

## PRAYER FOR RELIEF

Plaintiff Green prays for the following relief:

    A.    Award back pay and all benefits;

    B.    Reinstatement to his rightful place;

    C.    Alternatively, award appropriate Front Pay;

    D.    Award all actual and compensatory damages;

    E.    Award attorney fees, costs, and expert witness costs and fees;

    F.    Award interest from the earliest possible date;

    G.    Grant all other injunctive and appropriate relief at law and in equity as this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY OF SIX**

Respectfully submitted

*/s/ John Mosby*

John Mosby
621 17th Street, #1035
Denver, CO 80293
Tele: 303. 623-1355
Email: John_Mosby@msn.com

Marilyn Cain Gordon
7603 Georgia Avenue, N.W.
Suite 304
Washington, D.C. 20012
Tele: 202.723.8600
Email: Marilyn_Gordon@msn.com

ATTORNEYS FOR PLAINTIFF

<u>Plaintiff's Address</u>
19432 East Milan Circle
Aurora, CO 80013